Filed 6/20/25  P. v. Morales-Orellana CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE MORALES-ORELLANA,<br><br>    Defendant and Appellant. | F087317<br><br>(Super. Ct. No. F22904809)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Gregory T. Fain, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Kari Mueller and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Jose Morales-Orellana lived in a two-bedroom apartment with several adults and children, including defendant's two children, their mother E., another woman V., and V.'s son J. One evening while V. was gone, E. walked into the kitchen and saw J. on his knees orally copulating defendant. About three months later, E. reported what she had seen to her son's school psychologist who, in turn, reported the incident to police.

When interviewed by police, E. and J. gave generally similar statements about what had occurred, and defendant was arrested and charged. At trial, E. recanted certain statements she had made to the psychologist and to the police, indicating she had *not* actually witnessed anything happen between defendant and J. A jury ultimately convicted defendant of one count of forcible oral copulation of a child under 14 years of age and more than 10 years younger than defendant, and he was sentenced to the middle term of 10 years. (Pen. Code, § 287, subd. (c)(1), (2)(B).[1])

On appeal, defendant argues the trial court erred as a matter of state and federal law by precluding the defense from impeaching J. about a statement defendant overheard J. make to his mother regarding whether J. could take defendant's United States citizenship and transfer it to himself. Although relevant to J.'s credibility as evidence of bias, we conclude the trial court did not err in precluding the defense from impeaching J. with that statement under Evidence Code section 352, and, thus, there was no confrontation clause violation under the federal Constitution.

Defendant also argues the trial court erred in imposing the middle term at the sentencing hearing by failing to recognize mitigating circumstances had triggered the lower-term sentencing presumption under section 1170, subdivision (b)(6). However, there was no factual basis to conclude the mitigating circumstances identified were "a contributing factor in the commission of the offense" necessary to trigger the lower-term

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

sentencing presumption under section 1170, subdivision (b)(6), and the trial court did not abuse its discretion in selecting and imposing the middle term. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

At the time of the incident (Feb. 2022), defendant was living in a two-bedroom apartment with several others, including his partner E., their two children, another woman V. and her son, J., and V.'s brother. Defendant created a bedroom for V. and J. in the living room by dividing the room with plastic. According to E., defendant and V. got along without arguing, but neither defendant nor E. got along well with J., who was 12 years old at the time. E. wanted V. and J. to move out of the apartment, and she thought V. and defendant were engaged in a sexual relationship.

E. testified that on February 13, 2022, she, defendant and their son were watching television in the living room; Jane, defendant's daughter, was in one of the bedrooms; V. was gone; and J. was in the portion of the living room sectioned off as a bedroom. At some point, E. got up to go to the bathroom, but when she came back, about a minute later, she saw J. on his knees near a table several feet from the kitchen. She asked him why he was on the floor, but he did not answer her; he appeared scared. She turned on the kitchen lights and noticed defendant was standing in the kitchen by the stove. She then asked J. what was going on, and he started saying defendant had done "dirty things" to him. She felt badly because she has a son, and her daughter was touched by a man when she was seven years old. Defendant heard what J. said, and he appeared to E. to be frightened. E. became upset with defendant, and he asked her how she could believe J. when he was a liar. She and defendant did not discuss the matter further that evening. She denied telling police defendant had admitted to her that he had received oral sex from J. since February 11, 2022; she was not sure that any of it happened.

Two days later, upset about what J. had said, E. later talked to her son's school psychologist over the phone about the incident, but E. did not think the psychologist

3.

understood her well because the psychologist later told police that E. said things that she had not said. E. testified she told the psychologist that when she walked in, J. was kneeling and the lights were off; J. said defendant had been doing "things," but she never saw defendant doing those "things." An officer came to the apartment the night E. talked to the psychologist. After the officer left, she and J. got into a physical altercation about flowers defendant had given E. which J. ruined.

Defendant and E.'s daughter, Jane, testified that on the evening of the incident, she was in a bedroom when she heard J. yelling in the apartment. She went to the kitchen and saw E. and J. were frustrated. J. was in the kitchen, and E. was outside the kitchen; they were both standing. Defendant then left to go outside. Jane was interviewed by police at some point later, but she did not remember exactly when. She denied telling an officer that, after hearing yelling, she saw J. running down the hallway; she also denied telling the officer she had asked E. what happened; and she denied telling the officer that her mother had begun to cry and told Jane she had caught J. on his knees orally copulating defendant. She also denied telling the police officer that E. had called J. a "faggot" because of what had happened.

J. testified that on the night of the incident, he was watching television on the couch with defendant; he could not remember if anyone else was present. Defendant got up to wash dishes, and called J. over to the kitchen. E. was not present, and J. could not remember where she was at the time. Thinking defendant wanted help, J. went into the kitchen, but defendant grabbed J. by the shoulder, forced J. to his knees, pulled down his pajamas and had J. orally copulate him. J. believed E. saw what happened because when she came into the kitchen, she slapped defendant and asked what they were doing. J. left the kitchen and went to Jane's room. He did not report the incident to the police, but he did talk to them at some point after the incident.

Before this happened, he got along normally with defendant—nothing like this had happened before and they did not argue, nor did they have fights or disagreements that he

4.

could remember. He did not remember insulting defendant, and J. had broken a window in the past, but it was an accident. J. never got along well with E. After the incident, he had a physical altercation with E., but he could not remember what it was about; she had come out of her room calling him names; she grabbed J.'s shirt and tore it.

J.'s mother, V., testified she and J. had lived in the apartment with defendant for three years before this happened. She and E. did not generally get along very well; E. would insult V. and treat J. badly; before this incident, E. had told them to leave the apartment and V. had refused. Things were also not going well with defendant before this incident happened; defendant had rejected J. and wanted him out of the apartment. She denied she had any romantic relationship with defendant. About a week after the incident, E. told her what happened; J. was in the room. V. did not call the police because she wanted to talk to J.; she thought E. was lying. When V. talked with J., she realized it was true, but she still did not call the police because she was scared. Eventually, she was interviewed by police at the apartment about 20 days after E. told her what had occurred.

Adriana Castaneda, a school psychologist, testified E. called her on the telephone in May 2022 and told Castaneda that about a month prior to the phone call, E. had walked in on defendant receiving oral sex from a minor who lived in their home. Specifically, E. told Castaneda she had walked into the kitchen, turned on the light, and defendant and the minor were engaged in oral sex. E. said nothing about a physical altercation with J. Castaneda called child protective services the same afternoon she received E.'s call, and then she called the police.

Lieutenant Gerardo Galaviz testified he had interviewed defendant's daughter, Jane, in May 2022; Jane told Galaviz that she was in her bedroom when the incident occurred, which she told the officer was sometime in February 2022. Jane said she had heard her mother yelling, and she went out into the living room. Jane told the officer that E. told her what E. had seen in the kitchen, and Jane observed E. was emotional, hysterical and crying about the incident. Jane heard E. call J. a derogatory name, and

Jane told the officer she was so embarrassed by the situation she ended up running away. Jane did not mention anything to Galaviz about an altercation between E. and J.

Sergeant Santiago Jurado responded to the apartment with another officer, Eduardo Barrera, and helped translate Barrera's interviews with E. and J. Barrera testified he interviewed E., and she told him (through Jurado's translation) that she had been married to defendant for several years and they had two children; E. said the incident with J. occurred on February 13, 2022, while J. and defendant were watching soccer. E. had gone to the bathroom for less than 10 minutes, and when she came back, the lights were off in the kitchen area and she saw defendant standing in the kitchen and J. was on his knees directly in front of defendant. According to E., defendant's pants were down, and his penis was exposed, and J. had defendant's penis "essentially inside of [his] mouth." E. said she yelled at both defendant and J. about what she had seen, and called J. derogatory names; E. said she was shocked and could not believe it. E. told J.'s mother about the incident the same day.

J. told Barrera that E., defendant and his mother were in the apartment that day. J. said that he was watching television with E. and defendant; E. left the room at some point, and defendant went into the kitchen. J. went to the kitchen, and defendant grabbed him by the back of the neck and forced him to his knees. J. said defendant had not pushed him down that hard, and J. did not yell out or try to fight back. J. said this had never happened before.

Defendant testified he and E. had been together for 16 years, and things were fine in the beginning, but she had become very jealous. He had cheated on her several times while they were together, and they are no longer in a romantic relationship. He knew J. a little over two years; when J. and V. first moved into the apartment, they were "behaving well." But as they got comfortable, they made demands and every day he seemed to have problems with them. J. created problems by insulting defendant and talking back;

6.

arguing with his mother; breaking windows; and hitting defendant's son. Defendant never considered himself a father figure to J.

Defendant had little communication with J. before this. On the day of the incident, defendant was watching soccer with his son and E.; J. was in the area of the living room that defendant had partitioned for J. and V.'s bedroom. E. got up to go to the bathroom, and defendant went to the kitchen to make a cup of coffee next to the stove. E. came into the kitchen and turned on the lights, and defendant returned to the living room to watch the soccer game—there was no disturbance; it was a peaceful night. He denied calling J. into the kitchen, and E. never confronted defendant about the incident.

Defendant's landlord testified she was aware defendant had been trying to evict people from his apartment, but she did not know the identity of those people.

The jury found defendant guilty of one count of forcible oral copulation with a child under 14 years of age. After denying a motion for a new trial, defendant was sentenced to the middle term of 10 years. This appeal followed.

## DISCUSSION

### I. Cross-examination and the Confrontation Clause

The trial court precluded the defense from cross-examining J. on a statement that defendant purportedly overheard him make to his mother that pertained to J. taking defendant's citizenship and applying it to himself. On appeal, defendant contends prohibiting cross-examination on this issue was improper under state evidentiary law and constituted a violation of defendant's confrontation rights under the federal Constitution. The People dispute the trial court abused its discretion in limiting the scope of cross-examination under Evidence Code section 352, and, thus, did not violate defendant's confrontation rights under the federal Constitution.

### A. Additional Background

Defendant filed a pretrial motion in limine seeking to cross-examine J. about J.'s "belief that he would benefit from making false accusations in order to get citizenship

7.

and (2) his belief that testifying for the prosecution will enhance his eligibility to gain citizenship." (Full capitalization and boldface omitted.)[2] The prosecution filed a motion in limine seeking to exclude any statements regarding immigration status that may have been made by a witness, documentation of immigration status in a police report, or any statements to that effect made by a witness to the People or disclosed to the defense.

During a hearing on the pretrial motions, the defense proffered that one or two months before the allegations in this case were made, defendant overheard J. say to his mother V., "'Maybe we can take [defendant's] citizenship and apply it to me.'" Defendant interrupted the conversation and told them "'[t]hat's not how it works.'" Defense counsel argued that cross-examination about J's purported statement was relevant to show J.'s bias and his motive to make allegations against defendant.

Pursuant to the People's motion in limine seeking to preclude inquiry about a witness's immigration status, the court held a brief in camera hearing where the prosecutor supplied information concerning the witnesses' immigration status pursuant to Evidence Code section 351.4.[3] After that hearing, the court noted it had been concerned with whether someone had been offered a benefit for coming to court and testifying, which would be relevant but still subject to an Evidence Code section 352 balancing test. The court explained the parties' separate motions in limine related to different

---

**2**      The motion in limine did not contain a proffer of any statements exhibiting J. held such beliefs. The specific statement proffered by the defense during the hearing on the motions in limine did not include any reference to false accusations or testifying for the prosecution.

**3**      Evidence Code section 351.4, subdivision (a), provides, "In a criminal action, evidence of a person's immigration status shall not be disclosed in open court by a party or their attorney unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status." The statute does not apply to cases in which a person's immigration status is necessary to prove an element of the offense or an affirmative defense, limit discovery in a criminal action, or prohibit a person or their attorney from voluntarily revealing the person's immigration status to the court. (*Id.*, subd. (b)(1)–(3).)

witnesses—the prosecutor's motion related to J.'s mother, and the defense motion related to J. The court explained the in camera hearing pertained "more towards People's [motion in limine No. 5]. I would not allow any impeachment or any bringing up the fact that, oh, isn't it true you're an illegal alien, you're an undocumented immigrant. Something to that effect would be totally improper, okay, and would not be relevant. I would not allow it. If it's deemed to be relevant, then it's excluded under [Evidence Code section] 352. And certainly that pertains to the witness, the mother witness." On this basis, the court granted the People's motion in limine with respect to J.'s mother.

The court then moved to the defense motion in limine regarding cross-examination of J., which would involve reference to his immigration status. Defense counsel clarified the statement J. had made to his mother about taking defendant's citizenship for himself was made a month or two before the allegations surfaced. Defense counsel reiterated its motion was not "about benefits of a criminal trial for a U-Visa," and was instead seeking to inquire about the basis of the conversation J. had with his mother surrounding citizenship generally. Defense counsel argued Evidence Code section 780 permits admission of testimony showing bias or motive to lie, and reiterated J.'s understanding did not have to be true for it to be relevant; what was relevant, defense counsel argued, was that J. believed he could transfer defendant's citizenship to himself. Defense counsel indicated the impeachment questioning on this issue would be "very brief." The prosecution argued the proffered statement was very vague, and subject to multiple interpretations; defense counsel countered that this would be something that could be clarified during questioning. The court reserved ruling on the issue, and revisited the motion the following day.

At the next day's hearing, the court confirmed the prosecution had made no promises about assisting anyone with their immigration status, including a U visa to either J. or his mother; to the prosecutor's knowledge, no application for a U visa had

been filed.[4]  The court denied the defendant's motion in limine as to the scope of cross-examination of J.  The court explained that while the overheard statement may "have some degree of relevance," it was very slight—the statement was vague, and the incident was not reported to police by J. or his mother, reducing its probative value.  Because the desired questioning would implicate J.'s immigration status, which posed a substantial risk of prejudice, the testimony was to be excluded under Evidence Code section 352.  The court also noted it did not believe a limiting instruction would ameliorate the prejudice.

Following trial, the defense filed a motion for a new trial, arguing the court had erred in its pretrial ruling by prohibiting defense counsel from cross-examining J. on his statement to his mother.  At the hearing on the motion, defense counsel argued the ruling denied the defense the right to explore the biases or motives J. might have had to testify against defendant.  The court denied the motion for a new trial, and again concluded that precluding cross-examination on this issue was proper under Evidence Code section 352.

### B.  Relevant Legal Principles and Standard of Review

"'[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors … could appropriately draw inferences relating to the reliability of the witness."'" (*People v. Frye* (1998) 18 Cal.4th 894, 946, citing *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 (*Van Arsdall*), quoting *Davis v. Alaska* (1974) 415 U.S. 308, 318.)  "However, not every restriction on a defendant's

---

[4]  A U visa is an avenue to supply noncitizens with legal status when they are the victims of certain crimes and assist in the investigation and prosecution of those crimes. (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1267 & fn. 1 (*Castaneda-Prado*).)  If the U visa is approved by the United States Citizenship and Immigration Services, the status conferred is valid for four years (8 C.F.R. § 214.14(g)), and, after three years, the holder may apply for lawful permanent resident status (8 U.S.C. § 1255(m)).

desired method of cross-examination is a constitutional violation.  Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.  (*Van Arsdall, supra*, 475 U.S. at pp. 678–679; [citation].)  California law is in accord.  (See *People v. Belmontes* (1988) 45 Cal.3d 744, 780.)”  (*Frye, supra*, at p. 946, accord, *People v. Dalton* (2019) 7 Cal.5th 166, 217.)

Thus, the threshold question under *Van Arsdall* is “whether the trial court exercised sound discretion under state law evidentiary standards in limiting the scope of cross-examination” under “the deferential abuse of discretion standard of review governing such discretionary questions.”  (*Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1282.)  “If the trial court excluded ‘evidence of marginal impeachment value’ [citation], or otherwise merely carried out the routine evidentiary function of controlling the scope of permissible cross-examination, the answer to this initial evidence question will generally be yes—the trial court was within its discretion—and the inquiry comes to an end.  There was no error, under either state law or under the Sixth Amendment.” (*Ibid.*)  However, when a trial court “effectively renders cross-examination an exercise in futility, we must proceed to a second stage of analysis” and ask “whether ‘[a] reasonable jury might have received a significantly different impression’ of the challenged witness’s credibility if the proposed line of cross-examination had been permitted.”  (*Ibid.*, quoting *Van Arsdall, supra*, 475 U.S. at p. 680.)

“While our Supreme Court has not squarely addressed the standard of review applicable to [the second] aspect of the *Van Arsdall* analysis, the court generally speaks of abuse of discretion when addressing claims of *Van Arsdall* error.”  (*Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1283.)  “Where courts reach the second stage of the *Van Arsdall* analysis and find error, reversal is required unless the government can show the error was harmless beyond a reasonable doubt under *Chapman* [*v. California* (1967) 386 U.S. 18, 24].”  (*Ibid.*)

11.

## C. Analysis

Defendant argues J.'s statement was evidence of potential bias and motive to fabricate the allegation of sexual activity, which directly implicated J.'s credibility—a central issue in the case. Defendant maintains there was no physical evidence corroborating the incident, and J.'s testimony about the incident was inconsistent and contradictory, suggesting possible fabrication. According to defendant, the trial court failed to consider the significant probative value of the proposed line of questioning, and because the cross-examination would have been focused narrowly on whether J. made the statement, it posed little risk of prejudice. Had the trial court not erred in precluding cross-examination on this issue, the jury would have received a significantly different impression of J.'s credibility, establishing a confrontation clause violation.

We first examine the threshold evidentiary question under state law and ask whether the trial court exercised sound discretion in precluding cross-examination of J. on this issue. If the trial court did not abuse its discretion in doing so, there is no violation of state evidentiary law or federal constitutional error, and the inquiry ends. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 807–808 [no abuse of discretion in restricting cross-examination under Evid. Code, § 352, and thus no violation of federal constitutional confrontation right to cross-examine adverse witness]; *Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1282.)

Relevant evidence is defined as evidence that has any reasonable tendency to prove or disprove any disputed fact that is of consequence to the determination of an action. (Evid. Code, § 210.) "As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias." (*People v. Brown* (2003) 31 Cal.4th 518, 544.) Impeachment evidence regarding a witness's motivation to lie can be deemed relevant to prove a disputed material fact. (See Evid. Code, §§ 210, 780, subd. (f); see *People v. Contreras* (2013) 58 Cal.4th 123, 152.)

12.

"The outer bounds of relevance, always within the trial court's discretion to set, are subject to the court's authority to exclude proffered evidence 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Castaneda-Prado, supra,* 94 Cal.App.5th at p. 1284.) The balancing test under Evidence Code section 352 is conducted on a sliding scale: "The more substantial the probative value of the evidence, the greater the danger of the presence of one of the excluding factors that must be present to support an exercise of trial court discretion excluding the evidence. [Citation.] [¶] Where the evidence relates to a critical issue, directly supports an inference relevant to that issue, and other evidence does not as directly support the same inference, the testimony must be received over a[n Evidence Code] section 352 objection absent highly unusual circumstances." (*Kessler v. Gray* (1978) 77 Cal.App.3d 284, 291–292.)

While we agree J.'s prior statement about taking defendant's citizenship and applying it to himself was relevant as evidence of bias or motive, relevance "only begins the analysis," as even relevant evidence may not be especially probative and may pose a significant risk of prejudice. (*People v. Villa* (2020) 55 Cal.App.5th 1042*,* 1052.) The probative value of evidence is measured by how strongly the evidence serves to make more or less probable the existence of a fact consequential to the litigation, coupled with the proponent's need for that item of evidence. (See 29 Am.Jur.2d (2025) Evidence, § 321; *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1155 [probative value of evidence "includes an evaluation of how strongly the evidence tends to prove the material fact at issue"].)

The strength of the proffered statement to show bias or motive was weak. There was no link tying J.'s statement to the allegations in this case or the criminal prosecution to suggest J. believed making false allegations against defendant was a method to transfer defendant's citizenship to J. The statement was made about one or two months before the

abuse was reported; even if J. made the statement, there was no temporal link showing it was made in contemplation of these allegations or criminal proceedings. Neither J. nor his mother initiated a report of the allegations following the conversation. Additionally, because of the statement's timing before the incident was reported, the statement could not have been precipitated by the criminal case or any information that might have been gleaned from the prosecutor about a U visa or other immigration benefits. The proffered statement did not suggest any link to the allegations to infer it established a motive to lie about them, nor did it strongly suggest other bias against defendant.

Moreover, showing J. fabricated the incident based on an isolated conversation about J.'s and defendant's citizenship was not particularly probative given the independent, corroborating evidence. E. told her son's school psychologist, and later police, that she had personally witnessed the abuse; her daughter told police E. contemporaneously told her what E. had witnessed, and her daughter was so embarrassed by what occurred, she told police she had run away from home. (See *People v. Villa, supra*, 55 Cal.App.5th at pp. 1053–1054 [impeachment for bias evidence had only slight probative value because there was extensive corroboration for victim's testimony, both documented and from other witnesses].)

The situation here is in stark contrast to *Castaneda-Prado*, where a victim initiated a report of molestation, admitted under oath at the preliminary hearing she had submitted a declaration for a protective order relating to the abuse to assist her mother in obtaining a U visa, and she added more details to her account of the abuse as the prosecution progressed. (See *Castaneda-Prado, supra*, 94 Cal.App.5th at pp. 1287–1288.) The trial court refused to permit cross-examination on the victim's preliminary hearing statement regarding the U visa, but the appellate court reversed. In finding its probative value high and not substantially outweighed by the risk of prejudice, the appellate court explained there was little corroborating evidence of the molestation beyond the victim's testimony, making the victim's credibility pivotal to the case; the fact the victim acknowledged

14.

under oath she knew about the benefits of the U visa and that she was motivated by them was highly probative of her credibility and her motive to fabricate the molestation and/or details about it. (*Id*. at pp. 1285–1287.)

Unlike the preliminary hearing testimony that was the subject of the proposed impeachment inquiry in *Castaneda-Prado*, whether J.'s prior statement had even been made was in question; the statement bore a tenuous link, if any (both in terms of timing and context of the statements), to the subsequent allegations or the criminal prosecution such that it was not significantly probative of bias or motive to lie. On its own, the proffered statement did not strongly indicate a bias or motive to lie about the incident. And, while J.'s credibility was an important issue in the case, it was not the sole evidence establishing the incident occurred—there was evidence E. had witnessed it. Moreover, the defense had the ability to cross-examine J. extensively on his potential bias against defendant and inconsistencies in his statements about the incident, topics which were explored in detail. (*People v. Gutierrez, supra*, 45 Cal.4th at p. 808 [other subjects on which witness was cross-examined amply demonstrated potential bias, ameliorating need for the precluded cross-examination].)

On the other hand, the risk of undue prejudice posed by the inquiry was significant and substantial because it would have implicitly indicated J.'s immigration status, regardless whether he simply denied making the statement and the inquiry ended. Courts "have recognized the strong danger of prejudice attendant with the disclosure of a party's status as undocumented immigrant." (*Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1213.) As the trial court recognized, admitting the statement necessarily implicated J.'s immigration status, and carried an inherent and substantial risk it would inflame the jury's scorn or hostility toward the witness. (See *People v. Doolin* (2009) 45 Cal.4th 390, 439 ["[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or

punish one side because of the jurors' emotional reaction."].) While J.'s statement was relevant, its probative value was not particularly strong, and the countervailing risk of prejudice was substantial. While a witness's immigration status may be admissible under Evidence Code section 352 (see *People v. Casillas* (2021) 65 Cal.App.5th 135, 151), the trial court did not abuse its discretion in determining the risk of prejudice here substantially outweighed its probative value.

We disagree with defendant's assertion the trial court's analysis misconstrued the nature of the bias evidence by focusing on whether J. would actually receive immigration benefits rather than his subjective belief that accusing defendant might confer such benefits. The trial court considered the issue of the U visa, and whether benefits were discussed or applied for with the prosecutor, primarily in the context of the People's motion in limine—it did not conflate whether immigration benefits were sought, promised, or applied for with the issue of J.'s subjective belief about whether he might somehow transfer defendant's citizenship to himself.

We conclude the trial court did not err in finding that J.'s statement was of only slight probative value that was significantly outweighed by the risk of prejudice to the victim under Evidence Code section 352, and, thus, there was no concomitant violation of defendant's Sixth Amendment right to confront adverse witnesses.

### D.    Sentencing:  Lower-term Presumption

Defendant was found guilty of forcible oral copulation of a child under 14 years of age and at least 10 years younger than defendant. (§ 287, subd. (c)(1), (2)(B).) The relevant sentencing triad is eight, 10 or 12 years. (*Id.*, subd. (c)(2)B).) The trial court imposed the middle term, concluding the lower-term presumption under section 1170, subdivision (b)(6), was not applicable. Defendant argues the trial court abused its discretion because the lower-term presumption was triggered, and the trial court did not make sufficient findings necessary to find it had been overcome.

16.

### E. Additional Background

Probation recommended the middle term, and the prosecution agreed; defendant filed a statement in mitigation seeking the mitigated term. Defendant's statement explained he had grown up in extreme poverty in El Salvador, and had to leave school in the third grade to help work on the family farm; he suffered severe physical abuse from his father, who beat him; and he grew up during intense gang warfare and was constantly exposed to gunfire, forcing him to maintain a low profile from a young age. The statement then indicated "[t]he commission of the current offense is connected to the defendant's prior victimization or childhood trauma, or mental illness as defined by section 1385[subdivision ](c)."[5] A mitigation report, prepared by two defense social work practitioners, was submitted as an exhibit to defendant's statement in mitigation. It elaborated in more detail about defendant's childhood, and his move to the United States.

At the hearing, the People argued there was "no nexus that's been established between [the mitigating factor] and the defendant's commission of this crime. The Court would have to believe that it was a factor in the commission of the crime that the defendant committed. I don't think that's clear. There's been no evidence presented of that." The court concluded the middle term was appropriate, and provided the following rationale for its sentencing decision:

"So the Court has considered the recommendation of probation. I considered the evidence presented during the course of the trial. I considered the factors in mitigation as discussed by the Defense and specifically the Defense's request to consider child trauma or psychological or physical abuse as a factor so that the Court would not—would be more inclined to go with the—go under [section] 1170[, subdivision ](b)(6) to go to a lower term rather than the middle term as recommended by probation. [¶] Part of the

---

[5] The record was augmented to include the attachment to defendant's statement in mitigation.

difficulty with that factor in mitigation is his current age is 62. I mean the only person in the courtroom who is older than [defendant] is myself, but he's lived a good long life. So that, that factor just doesn't have the weight it would have with me if he were a younger person. He's lived a lot of life. The sentence then, and I've considered it, but it's not—to me it's not determinative in regard to selection of the term, so at this time, go through the factors as follows."

The court then explained it found the crime to be an aggravated one. The case "involved a very young child, abuse. You know, and what's disturbing about the case to me a little bit is I don't want to minimize things, but you have a young immigrant child being housed in a, you know, a home where there's plastic across the middle of the living room and subdivided in different areas, living with other people who are not relations. This is … illustrative of a dangerous situation these young people were put in when they come into the country and in this type of status to being exposed to … this type of crime." Other than that, the court concluded there were no other aggravating factors: "[Defendant] lived a largely legally blameless life. He has a [driving under the influence] as referenced that he was on probation for had another one pending, which I don't consider the pending one because it's being dismissed. But other than that, he's lived a law-abiding life which is commendable." The court concluded it was "not persuaded this is one where the Court is required to do a mitigated term," and the court imposed the middle term of 10 years.

### F.      Analysis

Discretionary sentencing decisions are reviewed on appeal for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Salazar* (2023) 15 Cal.5th 416, 428, fn. 8 (*Salazar*).) A court abuses its sentencing discretion when it acts arbitrarily and capriciously, relies on improper matter in reaching its decision, or misunderstands the scope of its discretion such that it does not exercise informed discretion. (*People v. Panozo* (2021) 59 Cal.App.5th 825, 837; *People v. Carmony* (2004) 33 Cal.4th 367, 377.)

It is presumed the trial court acted to achieve legitimate sentencing objectives (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977–978), and an appellate court may not presume error from a silent record (*People v. Carmony, supra*, at p. 378; *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.)  "Unless the record affirmatively demonstrates otherwise, the trial court is deemed to have considered all the relevant sentencing factors set forth in the rules."  (*People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 322.)

As noted, the punishment for forcible oral copulation of a child under 14 years of age under section 287, subdivision (c)(2)(B), is eight, 10 or 12 years.  The trial court's selection of the lower, middle or upper term is governed by section 1170, subdivision (b).  Relevant here, section 1170, subdivision (b)(6), creates a presumption that the court should impose the low term if "the following was a contributing factor in the commission of the offense:  [¶]  (A) The [defendant] has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence."  The mere fact one or more mitigating circumstance exists is insufficient to make this initial showing—the mitigating factor identified must be "a contributing factor in the commission of the offense" for the lower-term presumption to apply.  (*Ibid.*; accord, *People v. Knowles* (2024) 105 Cal.App.5th 757, 765; see *People v. Fredrickson* (2023) 90 Cal.App.5th 984, 992 (*Fredrickson*) [lower-term presumption does not arise unless it is shown that mitigating factor was a contributing factor in the commission of the offense under § 1170, subd. (b)(6)].)  If the initial showing is made, the lower-term presumption is triggered; the presumption will be overcome only if the court "finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice .…"  (§ 1170, subd. (b)(6).)

Defendant argues his statement that childhood trauma was a factor in the commission of the crime triggered the lower-term presumption under section 1170,

19.

subdivision (b)(6), and the trial court was required to find any aggravating factors outweighed the mitigating circumstance such that imposing the lower term would be contrary to the interests of justice. Defendant relies on our Supreme Court's decision in *Salazar*, where it cited *People v. Frahs* (2020) 9 Cal.5th 618, 638–640 (*Frahs*) in explaining the Attorney General had conceded the record disclosed the defendant *may* have suffered a qualifying trauma, "which would appear to meet [section 1170, subdivision (b)(6)'s] threshold requirement for triggering the lower term presumption." (*Salazar, supra*, 15 Cal.5th at p. 419; accord, *id.* at p. 426.)

    *Salazar*, like *Frahs*, involved retroactive application of ameliorative changes in the law: *Salazar* considered the retroactive application of the lower-term presumption under section 1170, subdivision (b)(6), as amended by Senate Bill No. 567 (2021–2022 Reg. Sess.), effective January 1, 2022 (Stats. 2021, ch. 731); *Frahs* involved retroactive application of section 1001.36, pertaining to pretrial diversion enacted under Assembly Bill No. 1018 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 34, § 24.) *Frahs* explained that because the defendant was convicted before the new diversion statute became effective, it was "unlikely" the record on appeal would "include information pertaining to several eligibility factors" (*Frahs, supra*, 9 Cal.5th at p. 638), and that to require defendants show they meet all the threshold eligibility requirements before an appellate court may remand the case to the trial court "would be inconsistent with any sensible retroactive application of [section 1001.36]." (*Ibid.*) *Salazar* cited *Frahs* in pointing out there was evidence of a qualifying trauma in the record before it—which was a threshold factor (not the *only* factor) in triggering the lower-term presumption. In the context of retroactive application of section 1170, subdivision (b)(6), much like in *Frahs*, this was sufficient to show the trial court may have reached a different sentencing conclusion given the possibility the lower-term presumption might apply. *Salazar* does not stand for the proposition that the lower-term presumption under section 1170, subdivision (b)(6), is triggered simply by alleging a qualifying trauma.

Nor are we persuaded a conclusory allegation that childhood trauma is connected to the commission of the offense necessarily triggers the lower-term presumption. Defendant relies on *People v. Lewis* (2021) 11 Cal.5th 952 and its discussion of allegations sufficient to make a prima facie showing of eligibility for resentencing under section 1172.6, but recall and resentencing under that statute is not an apt analogy. A court's original sentencing decision is not made through separate prima facie and evidentiary-hearing stages as provided in section 1172.6. In the context of an original sentencing decision, the threshold eligibility criteria *and* any supporting facts or evidence must be presented to the court to determine whether the presumption has been triggered. If the defendant does not present some factual basis to show that a mitigating factor is a "contributing factor in the commission of the offense," the necessary basis for the trial court to determine the lower-term presumption has been triggered is absent. (§ 1170, subd. (b)(6); *Frederickson, supra*, 90 Cal.App.5th at p. 992.)

Here, there was no basis, as a factual matter, for the court to conclude defendant's childhood trauma was a contributing factor in the commission of the offense. In referencing defendant's more advanced age, the trial court appeared to be explaining there was no temporal relationship between the childhood traumas defendant suffered and the offense committed to indicate it was a contributing factor. Further, the childhood traumas articulated were not similar to the offense such that they could facially suggest they contributed to the offense. Without some showing how the childhood traumas were a contributing factor to the offense, the eligibility criteria of section 1170, subdivision (b)(6), was not met, and the trial court did not abuse its discretion in concluding the lower-term presumption did not apply. (*Fredrickson, supra*, 90 Cal.App.5th at pp. 991–992 [lower-term presumption does not apply unless mitigating factor is a contributing factor in the commission of the offense].)

The trial court selected the middle term because it found the offense was committed in an aggravated manner: the victim was vulnerable as a minor living with

21.

adults who were not his relatives in crowded conditions. Unbound by the lower-term presumption, the trial court was free to impose the middle or low term in the exercise of its sound discretion. (§ 1170, subd. (b)(1), (6).) We find no abuse of discretion in how the trial court assessed the lower-term presumption or how it weighed the mitigating and aggravating circumstance to impose the middle term.

## DISPOSITION

The court's judgment is affirmed.

MEEHAN, J.

WE CONCUR:

PEÑA, Acting P. J.

SNAUFFER, J.